UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>- v. -<br><br>CARL ANDREWS,<br>    a/k/a "Day,"<br>    a/k/a "Dayshawn,"<br><br><div align="center">Defendant.</div> | **20 Cr. 546 (GRB)** |

**THE GOVERNMENT'S SENTENCING SUBMISSION**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Rushmi Bhaskaran
Elizabeth Espinosa
Assistant United States Attorneys
        *Of Counsel*

## PRELIMINARY STATEMENT

The Government respectfully submits this sentencing memorandum in advance of the sentencing of Carl Andrews scheduled for June 2, 2023.

As the Court is well aware, the procedural history of this case is unusual and complex. But perhaps a result, the factual record reflecting the defendant's offense conduct, his history, and his behavior is especially robust. That record includes a trial on sex trafficking charges in the Southern District of New York—where the Government was less than a day from resting—that was cut short because of the COVID-19 pandemic. The record also includes a second trial in this District in August 2021, after which a jury convicted Andrews of narcotics conspiracy. The evidence at these trials overwhelming established that the defendant was a prolific crack dealer, a pimp, and a sex trafficker who, through fraud, coercion, and threats of violence, caused a vulnerable, drug-addicted victim to perform commercial sex acts she did not want to commit.

In the Presentence Investigation Report (the "PSR") dated June 3, 2022, the United States Probation Office ("Probation") calculates the United States Guidelines Range (the "Guidelines" or "U.S.S.G"), using the crack cocaine Guideline, to be 121 to 151 months' imprisonment and recommends a sentence of 151 months' imprisonment.[1]  In light of recent Department of Justice ("DOJ") guidance promoting equivalent treatment of powder and crack cocaine, the Government has calculated the Guidelines range using the powder cocaine Guideline to be 78 to 93 months' imprisonment.

---

[1] The Government has informed Probation of its arguments regarding the applicability of additional enhancements that were not applied in the June 3, 2022 PSR. The Government understands that Probation is preparing its responses to the Government's and the defendant's objections and comments to the PSR.

The Government respectfully submits that the goals of sentencing—in particular, just punishment, promotion for the respect for the law, and adequate deterrence—will be served by a substantially above-Guidelines sentence of imprisonment of approximately 15 years. Such a sentence is sufficient, but no greater than necessary, to serve the legitimate goals of sentencing in light of the numerous aggravating factors in this case—especially, Andrews's deeply inhumane sex trafficking of Victim-1.

## I.        The Conduct Relevant to Sentencing

On August 9, 2021, the Court presided over the defendant's trial (the "August Trial") on Count Five of the Indictment, which charged the defendant with conspiracy to distribute 28 grams or more of cocaine base. On August 12, 2021, the jury found the defendant guilty of that charge. The evidence at the August Trial overwhelming established that, from late 2017 until his arrest in February 2019, the defendant was a prolific crack dealer in Suffolk County. In addition, the evidence proved that he sold substantial amounts of crack cocaine and powder cocaine—at least 200 grams—in just six months of a conspiracy that lasted over a year

The evidence presented at the August Trial, however, captured a mere sliver of his criminal conduct. As a jury in the Southern District of New York heard during a trial that began on March 9, 2020 (the "March Trial"), the defendant was not just a crack dealer. He was also pimp and a sex trafficker who, through fraud, coercion, and threats of violence, caused a vulnerable, drug-addicted victim to perform commercial sex acts she did not want to commit.

The following summary of the evidence draws from both the March and August Trials and reflects the totality of the defendant's conduct that is relevant to the Court's sentencing.

### A.  The Narcotics Conspiracy

The defendant met Geraldine Faustin in approximately October 2016. Transcript of August Trial ("Aug. Tr.") at 145. A few months later, they began dating. Aug. Tr. 146. Their relationship

was "very serious" and they effectively lived together from at least early 2018 until their arrest on February 28, 2019. Aug. Tr. 146, 152, 171, 174. The defendant told Faustin's family that he was a barber, but that was a lie. Aug. Tr. 146-147. Instead, he made a living by selling crack and cocaine. Tr. 147.

In late 2017, the defendant recruited Faustin to sell and deliver drugs from him. Aug. Tr. 147. Faustin—a home health aide making minimum wage with no prior criminal history—had no drug customers of her own; instead, the defendant would direct her to meet with his customers, and the defendant would supply Faustin with crack or cocaine. Aug. Tr. 143, 153, 208-209. Faustin gave all the money she collected from selling drugs to Andrews; she received no share of the profits. Aug. Tr. 149-151; 208-209.

With Faustin, the defendant sold crack and powder cocaine throughout Suffolk County beginning in late 2017. Aug. Tr. 147. From early 2018 until approximately March 2018, the defendant and Faustin sold crack from Faustin's home on Claire Court in West Babylon (the "Claire Court House"). Faustin testified that, during this time period, Andrews stayed at the Claire Court House five nights per week; made or directed her to make two sales of crack or cocaine each night he was there; and that 90 percent of those sales were crack cocaine. Aug. Tr. 151-153. She further testified that the most common value of those sales was $60, which would correspond to .6 grams of narcotics. Aug. Tr. 154. As calculated below as a conservative estimate, the defendant and Faustin therefore sold $3,240 worth of crack cocaine—or 32.4 grams—in just six weeks from Claire Court. Furthermore, the defendant sold about $360 worth of powder cocaine—or 3.6 grams—in the same time period.

**Table 1:  Crack Cocaine Sales from Claire Court, Early 2018 to March 2018**

| Faustin's Testimony | Crack Cocaine Calculation |
|---|---|
| Early 2018 to March 2018 | Approximately 6 weeks |
| Andrews stayed at Claire Court 5 days a week on average | 6 weeks x 5 days/week = 30 days |
| Two sales almost every day Andrews was a Claire Court | 30 days x 2 sales = 60 sales |
| 90 percent of sales were crack cocaine | 60 x .9 = 54 sales of crack cocaine |
| $60 was the most common value of the sale | $60 x 54 sales = $3,240 |
| $60 corresponds to .6 grams of narcotics | $100 corresponds to 1 gram of crack |
| **Estimated Weight from Claire Court, from Early 2018 to March 2018** | $3,240 crack sales / $100 (price per gram) = **32.4 grams of crack cocaine** |

**Table 2:  Powder Cocaine Sales from Claire Court, Early 2018 to March 2018**

| Faustin's Testimony | Powder Cocaine Calculation |
|---|---|
| Early 2018 to March 2018 | Approximately 6 weeks |
| Andrews stayed at Claire Court 5 days a week on average | 6 weeks x 5 days/week = 30 days |
| Two sales almost every day Andrews was a Claire Court | 30 days x 2 sales = 60 sales |
| 90 percent of sales were crack cocaine, so 10 percent were powder cocaine | 60 x .1 = 6 sales of powder cocaine |
| $60 was the most common value of the sale | $60 x 6 sales = $360 |
| $60 corresponds to .6 grams of narcotics | $100 corresponds to 1 gram of powder cocaine |
| **Estimated Weight from Claire Court, from Early 2018 to March 2018** | $360 crack sales / $100 (price per gram) = **3.6 grams of powder cocaine** |

Andrews also maintained a stash house located in Bayshore (the "Bayshore House"), from at least January 2018 until May 2018.[2]  As Faustin testified, during this time period, the Bayshore House was a squatter home—replete with surveillance cameras trained on the front entrance—where Andrews sold drugs on countless occasions.  Aug. Tr. 171-172.  Within the Bayshore House,

---

[2]As the Court is aware, pole camera footage of the Bayshore House was inadvertently not preserved.  The Government agreed not to elicit testimony about drug sales from the Bay Shore House during the time that the pole camera was operational, *i.e.*, from June 2018 to November 2018.

Andrews kept crack in bedroom and kitchen drawers.  In addition, Both Faustin and Victim-1 saw Andrews or an unidentified co-conspirator cook crack cocaine from the Bayshore House.  Aug. Tr. 173.  Victim-1 specifically recalled Andrews and an unidentified co-conspirator cook 50 grams of crack at his home in Bayshore. Aug. Tr. 281, 290.  Photographs recovered from the defendant's iCloud account resemble the crack rocks that both Faustin and Victim-1 witnessed the defendant cooking at the Bayshore House.  *See* GX 104H, 104I.

In approximately March 2018, Faustin told Andrews that she did not feel comfortable selling drugs from the Claire Court House.  Andrews then directed her to make sales from a ShopRite parking lot (the "ShopRite").  Aug. Tr. 155-156. Faustin testified that she made "a lot" of sales on a weekly basis at the ShopRite between March 2018 and May 2018, and that most common value of those sales was approximately $60 (or .6 grams of narcotics).  Aug. Tr. 157. Some of these sales were made to a confidential informant (the "CI") under the direction of Detective Jay Thomas, who testified at the trial.  As reflected in the recordings between the defendant and the CI (*see* GX 201-A-2, 201B-1, 201C-1, 201D-1), the defendant negotiated the sales; directed the CI where to park at the ShopRite to avoid detection; and surveilled the parking lot to determine whether law enforcement was present.  Over the course of three sales—on July 16, 2018, July 19, 2018, and August 1, 2018—the defendant sold the CI approximately 2.8857 grams of crack cocaine, and 2.0148 grams of powder cocaine:

**Table 3:  Crack Cocaine and Powder Cocaine Sales to the Undercover Officer**

| Date of Sale | Crack Cocaine | Powder Cocaine | Price | Price Per Gram |
|---|---|---|---|---|
| July 16, 2018 | .6946 grams (GX 302B) | .6581 grams (GX 302B) | $140 (Aug. Tr. 49) | $103.50 |
| July 19, 2018 | .7042 grams (GX 303B) | .6997 grams (GX 303B) | $140 (Aug. Tr. 62) | $99.72 |
| August 1, 2018 | .7645 +.7224 = 1.4869 grams | .6570 grams (GX 303B) | $200 (Aug. Tr. 69) | $93.28 |
| **Total** | **2.8857 grams of crack cocaine** | **2.0148 grams of powder cocaine** | $480 | $98.84 (average price per gram) |

For the August 1, 2018 sale, Andrews and Faustin arrived in a Black Mercedes (Aug. Tr. 70), which, as described below, was a vehicle that Andrews made Victim-1 put in her name while he trafficked her.

Towards the end of 2018, Andrews had to leave the Bayshore House.  He and Faustin settled into another squatter home, this time in Smithtown (the "Smithtown House").  Aug. Tr. 174, 177.  From there, Andrews continued to distribute narcotics.  Faustin witnessed several such sales and saw how Andrews stored the narcotics in the kitchen.  From the Smithtown House, Andrews dispatched Faustin to sell narcotics to a customer located in Central Islip.  Andrews and Faustin continued to sell narcotics until his arrest on February 27, 2019.  Aug. Tr. 177-178.

**B.  The Sex Trafficking Conduct**

All while continuing to sell drugs, in March 2018, Andrews entered a new venture:  sex trafficking Victim-1, a drug addict who, in early March 2018, had discharged herself from in-patient drug treatment to find drugs, including crack.  Ex. A, Transcript Excerpts from the March 2020 Trial (the "March Tr."), at 104.[3]  As with his crack dealing, Andrews did not act alone.  For

---

[3] The page numbers of the citations to the March Transcript refer to the page number of the transcript itself, on the upper right corner, in courier font.

example, he used and directed Faustin to assist with his efforts, by, among other things, having Faustin drive Victim-1 to dates, collect money from her, and distribute crack to Victim-1.

At the time that Victim-1 met Andrews, she had hit rock bottom.  She was estranged from her family members, had virtually no social support system, was homeless, unemployed, and had no money.  Ex. A, March Tr. 104, 112, 471-72.  Her only possessions were two suitcases of belongings she had brought to the drug treatment center and a nebulizer she was prescribed to use for asthma.  Ex. A., March Tr.  103-104.  She was also dealing with withdrawal from drugs, and experience she described as "torture," "like the world was ending," that made her "depressed" and "suicidal."  Ex. A, March Tr. 83, 88, 96, 100.

After leaving the drug treatment center, Victim-1 met Francisco Franklyn, whom she knew as "Mafia."  Ex. A, March Tr. 108.  Mafia, too, was a crack addict, and his crack dealer was Andrews.  Desperate to get drugs, and with no means to pay for them, Victim-1 told Mafia that she was considering working as a prostitute, and asked Mafia whether he knew of anyone who worked as a pimp.  Ex. A, March Tr. 109.  In Victim-1's mind, a pimp was someone who would "protect" her, help her get from place to place, and provide drugs.  Ex. A, March Tr. 109-10.

The pimp that Mafia knew was Andrews, so Mafia sent Andrews a photograph of Victim-1.  Andrews responded, in substance and in part, that he "want[ed]" Victim-1 to work for him as a prostitute.  March Tr. 112.  In an apparent effort to determine the depths of Victim-1's desperation, Andrews asked Mafia whether Victim-1 was homeless.  Ex. A, March Tr. 112.

Andrews and Victim-1 then spoke on the phone, and Andrews promised to post online advertisements for commercial sex on Victim-1's behalf, keep 60 percent of the proceeds Victim-1 made from commercial sex acts, and provide Victim-1 with the remaining 40 percent of the proceeds.  Ex. A, March Tr. 114.  Knowing that Victim-1 was a crack cocaine user, Andrews

agreed to supply her with it, but stated that drugs were not included in the deal. Ex. A, March Tr. 115. Victim-1 agreed to this arrangement. In her mind, it made sense that Andrews would get a greater share of the proceeds because Andrews would be posting the commercial sex advertisements, paying for hotel rooms, providing her with food, and transporting her. Ex. A, March Tr. 115.

Andrews's promises to Victim-1, however, were pure fraud. He paid Victim-1 none of the proceeds she made from working for Andrews. Ex. A, March Tr. 132-34, 139, 140-41. Indeed, the very first time Andrews came to Victim-1's room to pick up the money she had made, he violated their agreement and took all of it, claiming that he owed her nothing because he paid for the room and gave her crack. Ex. A, March Tr. 133. On another occasion, Andrews told Victim-1 that rather than reneging on his agreement with Victim-1, he was simply safekeeping her share of the proceeds so she would not spend it. Ex. A, March Tr. 133. Victim-1 testified that Andrews's refusal to pay Victim-1 any of the proceeds from her commercial sex acts violated the agreement they had, and that she would not have performed those sex acts if she had known that Andrews was going to take all of the money. Ex. A, March Tr. 133, 139.

After defrauding Victim-1, Andrews maintained his grip over through coercion, by manipulating her severe drug addiction. Andrews supplied Victim-1 with the majority of the crack that she consumed from March to May 2018. At the August Trial, she estimated that he gave her .5 to 1 gram of crack between 50 to 70 times—approximately 25 to 70 grams—in that time period. Aug. Tr. 272.

**Table 4:  Andrews's Distribution of Crack Cocaine to Victim-1**

|  | Low-End Calculation | High-End Calculation |
|---|---|---|
|  | .5 grams | 1 gram |
| 50 times | 25 grams | 50 grams |
| 70 times | 35 grams | 70 grams |

Andrews put a condition on whether he would supply Victim-1 with crack. He would only give it to her when she met financial "goals" set by Andrews. Ex. A, March Tr.141-43, 146. The "goal" was typically that Victim-1 engage in sufficient commercial sex acts each day to earn approximately $1,000 a day, and later $2,000, for Andrews. Ex. A, March Tr. 141-142. To reach these goals, Victim-1 would have to engage in commercial sex with as many as three to twenty men in a single day. Ex. A, March Tr. 145. If—and only if—Victim-1 met these goals, Andrews would supply Victim-1 with crack cocaine. Ex. A, March Tr.142-43. In other words, he ensnared Victim-1 in a horrific cycle of reward—in the form of just enough crack cocaine to keep her working—and punishment—where he would deprive her of drugs, a feeling Victim-1 likened to "torture." Ex. A, March Tr.144. The amount of crack cocaine that Andrews supplied to Victim-1 when she reached Andrews's goals, moreover, was never commensurate to the proceeds Victim-1 made from commercial sex acts. *See*, *e.g.,* Ex. A, March Tr. 99, 141, 145.

When Victim-1 did not reach her goals, she feared that she would not get any crack cocaine. Ex. A, March Tr. 143, 168-169. For Victim-1, that is when the "torture"—the feeling of going through withdrawal and not knowing if and when it would end—would begin. Ex. A, March Tr.144. The fear was compounded by the fact that she would have to perform commercial sex acts—work that she found awful—without the numbing effects of crack cocaine. Ex. A, March Tr.143. Victim-1 therefore kept working towards the goals set by Andrews—by seeking out and performing commercial sex acts she would not otherwise have committed—so that Andrews, her source of crack cocaine, would give her enough drugs to avoid a debilitating withdrawal. Ex. A, March Tr.144-45. Put differently, Andrews coerced Victim-1 into performing these additional commercial sex acts through a depraved cycle of reward and punishment.

Andrews's acts of coercion were not limited to his manipulation of Victim-1's drug addiction. Victim-1 testified that Andrews berated her and made her feel like she was worthless when she did not achieve his goals. Ex. A, March Tr. 142, 144. Andrews denied Victim-1 food when she was hungry. Ex. A, March Tr.144, 148, 224. Andrews would also wake up Victim-1 (or have Faustin wake her up) when she was sleeping, demanding that Victim-1 continue to solicit and perform commercial sex acts. Ex. A, March Tr. 149. When Victim-1 had no place to sleep, Andrews had her wait outside a gas station through the night until she began seeing commercial sex customers. March Tr. 233-34

In Andrews's toxic stew of coercion, Andrews also mixed in threats of violence. Victim-1 described one episode in which Andrews cupped his hand and pressed it against her face when they had a disagreement, and another episode where Andrews put his hands around her neck. Ex. A, March Tr. 151-152. Victim-1 testified that these events harmed her emotionally and made her scared that Andrews could be violent towards her. Ex. A, March Tr. 151-152. Victim-1 further testified that she could not just "walk away." Ex. A, March Tr.471-472. She was addicted to drugs, and Andrews was the primary source of drugs that she had. Ex. A, March Tr. 471. Given the singular role that Andrews has assumed in her life, Victim-1 also described how she had an "attachment" to Andrews and wanted to "make him happy." Ex. A, Tr. 174, 471-472.

Andrews profited immensely by his trafficking of Victim-1. Indeed, she was making thousands of dollars each week, which he kept in its entirety. He even had Victim-1 sell crack and cocaine to her prostitution clients on his behalf. Andrews told Victim-1 that those sales had to be at least an "eight ball"—or approximately 3.5 grams. Aug. Tr. 278-279. Victim-1 testified that she sold eight balls for Andrews some twenty to thirty times, and that most of these sales were

crack.  *Id*.  As a conservative estimate, this amounts to 38.5 grams to 56 grams of crack cocaine, and 31.5 to 49 grams of powder cocaine, as calculated below.

**Table 5:  Victim-1's Sales of Crack Cocaine and Powder Cocaine on Andrews's Behalf**

| Narcotic | Low End | High End |
|----------|---------|----------|
| Crack Cocaine | 11 sales (~55% of 20 sales) x 3.5 grams = **38.5 grams of crack cocaine** | 16 sales (~53% of 30 sales) x 3.5 grams = **56 grams of crack cocaine** |
| Powder Cocaine | 9 sales (~45% of 20 sales) x 3.5 grams= **31.5 grams of powder cocaine** | 14 sales (~47% of 30 sales) x 3.5 grams = **49 grams of powder cocaine** |

Flush with the cash he made from selling crack and prostituting Victim-1, Andrews bought himself a Black Mercedes S-Class.  Because he did not have a driver's license and had no credit, he made Victim-1 purchase the car, and take a car loan, in her name.  Andrews was delinquent in paying off the loan, which ruined Victim-1's credit history.  March Tr. 188-189

At the end of May 2018, Victim-1 tried to kill herself by injecting herself with a lethal dose of heroin.  Ex. A, March Tr. 241-242.  She tried to kill herself because she felt like she "had no way out."  Ex. A, March Tr. 242.  Victim-1 woke up from her attempted overdose because she choked on her own vomit.  Ex. A, March Tr. 242.  Because she did not die, she felt like she "needed to make something" of her life.  Ex. A, Tr. 242.  She stopped working for Andrews, sought help from law enforcement, and began her path toward recovery.  Ex. A, March Tr. 242-43, 498.

Victim-1's testimony concerning the coercion Andrews used to cause her to engage in commercial sex acts was corroborated by, among other things, text messages between Victim-1 and Andrews. For example, in a series of text messages on May 18 to 19, 2018, Victim-1 described how she no longer had a hotel room and had nowhere to sleep, had nothing to eat, and had been

sitting outside in the cold and rain. Ex. B, at 3-4.[4]  Victim-1 sent Andrews nearly 40 text messages begging Andrews to come pick her up. *Id.* at 5-7.  Andrews ignored her. *Id.*  Only when Victim-1 told Andrews that she found a customer, and after nearly 24 hours of pleading for Andrews's help, did Andrews finally reply to Victim-1, stating "That's my baby that's wat I'm talking about apply yourself babe you can do it." *Id.* at 7.  Victim-1 responded, "Love you," to which Andrews replied, "Love you more I just want you to get focused."  As Victim-1 testified, she understood Andrews to mean that he wanted Victim-1 to focus on making money for Andrews by engaging in more commercial sex acts.  Ex. A, March Tr. 234.

At the March Trial, Andrews's fraud, coercion, and threats of force, were further explained by the expert testimony of Dr. Chitra Raghavan, a tenured professor of clinical psychology at John Jay College.  Based on her training and experience, including her work with hundreds of survivors of sex trafficking, Dr. Raghavan was qualified to testify at the trial on the topics of sex trafficking, coercive control, and trauma.  Ex. A, March Tr. 512. Dr. Raghavan had never met Victim-1 or Andrews and had not reviewed any of the testimony or documents related to the case.  Ex. A, March Tr. 282-83.

Dr. Raghavan described the concept of coercive control, an "abuse dynamic" comprising several different, often subtle, coercive tactics, which sex traffickers use to coerce a person to engage in commercial sex acts, even without violence.  Ex. A, March Tr. 522.  Several of the tactics that Dr. Raghavan described, including the reward and punishment, micro-regulation, degradation and deprivation, closely mirrored the testimony of Victim-1.

---

[4] The page numbers refer to the exhibit page numbers, at the bottom of the page.

**Table 6:  Coercive Control Methods that Andrews Used on Victim-1**

| Tactic | Raghavan's Testimony | Victim-1's Testimony |
|---|---|---|
| Reward and Punishment | "[T]he abusers typically use a mixture of reward and punishment, which is he punishes in whatever way he punishes this particular woman, and then when she has a back to break, he rewards her. In other words, he gives her something that she needs. . . . We actually call it intermittent reward and punishment. . . . Intermittent because if she can guess when she's being rewarded and when she's being punished, she can actually control. And the whole point of coercive control is for the person to have as little control as possible."  Ex. A, March Tr. 534 | Q: "How much crack did he give you?" Victim-1: "It was – it was different at all times. Sometimes it was a 50 piece, sometimes it was a hundred. That's my guess, by the size, but it was – it was all different at all times. It was really whatever he gave me." Ex. A, March Tr. 134. |
| Micro-regulation | "Microregulation. . . refers to the constant daily control of small things in one's most private life, and by that I mean the length of your hair, how you dress, what time you wake up, the color of your nail polish, how many calories a meal can be, how much drugs you can take[.]" Ex. A, March Tr. 524-25. | "He used to nitpick. Like if I didn't have enough makeup on or if my eyebrow was out of place or if my hair wasn't straight. . . .  He liked my hair straight. So I tried to keep it straight."  Ex. A, March Tr. 152-153 |
| Degradation | "Degradation. . . . It's essentially humiliating the person by whatever means, calling them names, putting them down, telling them they'll never get a decent job because they're too ugly, too stupid, not educated enough, didn't finish school, have a | Q. "Generally speaking, what happened if you did not reach the goal that Day had set for you?" Victim-1: "He would say things like: You don't want to work. You don't want to win. You know, what are you doing wrong? Why aren't you making more? You know, what are you saying to these |

| Tactic | Raghavan's Testimony | Victim-1's Testimony |
|---|---|---|
| | drug addiction." Ex. A, March Tr. 532. | [guys]? What are you wearing? What did he look like? And then I wouldn't get high. I wouldn't really, you know." Ex. A, March Tr. 142 |
| Deprivation | "Deprivation is when you deprive someone of basic sustenance; so often sleep, waking women up in the middle of the night, or having them work through the night, but not being able to sleep during the day; food, controlling what they eat, how much they eat; and if they have a drug addiction, substances, what they can take, when they can take it, and who they can take it with." Ex. A, March Tr. 532 | "I just remember at the Holiday Inn, and I had gotten really sick when we were there. It was just like a cold. But because I have asthma, it's ten times worse. So I was having trouble breathing, and I was just miserable. And he had—I was on one bed, and he was on another. And we both fell asleep. He woke up, and he was checking my phone. And he's like, you're missing all these dates. Wake up." Ex. A, March Tr. 149. |

Dr. Raghavan also described the concept of traumatic bonding, an "attachment" or emotional connection or bond and sense of loyalty that results from being subjected to "multiple coercive tactics." Ex. A, March Tr. 574. Dr. Raghavan's testimony concerning traumatic bonding explained Victim-1's testimony that she felt a sense of attachment, loyalty, and affection towards Andrews, notwithstanding his acts of deception, coercion, and threats of violence against her.[5] *See* Ex. A, March. Tr. 174, 471.

---

[5] As to the relevance of Dr. Raghavan's testimony, Judge Engelmayer commented to the parties: "I listened very closely to the riveting testimony, frankly, of [Victim-1's] yesterday. And her testimony, if anything, reinforces the probative value of Dr. Raghavan's testimony. There were a number of moments during the testimony in which the witness articulated professions of startling loyalty and love for Mr. Andrews, notwithstanding the circumstances of their relationship that might have led a person in her position to the opposite view of him. It was striking to me. There is, to say the least, a fulsome factual predicate for an expert like Dr. Raghavan to explain this surprising phenomenon. So while the government had proffered that there would be testimony

### C.  Andrews's Obstruction of Justice in the SDNY Proceeding

While this matter was pending in the Southern District of New York, Andrews filed a motion to suppress certain evidence seized from the Smithtown House at the time of his arrest in February 2019.   In September 2019, Andrews submitted an affidavit in connection with a suppression hearing, in which he stated, among other things, that he had a privacy interest in the Smithtown House because he believed that Faustin had signed a lease for it.  *See* Ex. C.  Because there was a lease, Andrews argued that he had standing to challenge the seizure of crack cocaine that was found, in plain view, on the top of a dresser in the bedroom where Andrews was arrested. Andrews also argued in his motion that the crack cocaine was not on top of the dresser, but inside the drawer, and as a result, law enforcement agents violated his constitutional rights by searching the drawer without a warrant.

In denying the suppression motion (*see* Ex. D) in December 2019, Judge Engelmayer held that Andrews statements regarding the lease and the location of crack cocaine were false, although he stopped short of explicitly stating that it was an intentional falsehood.  *See* Ex. D,[6] at 13, ("That is false."); *id.* (describing the defendant's "false . . . statement about the lease"); *id.* at 24 (describing the "false statement by" the defendant); *id.* at 14 ("His statement about the lease arrangement is a bare falsehood . . . ."); *id.* at 15 (describing the "false claim of lessor status"). Furthermore, Judge Engelmayer denied the motion, holding that (1) the crack was seized in plain view; and (2) even if the crack was not seized on a plain view basis, Andrews did not have standing to suppress the evidence at the Smithtown House because he was a squatter.  Ex. D, at 9-13.

---

along these lines, I'm here to say, having listened closely to the direct, that the proffer has been validated and then some."  Ex. A, March Tr. 282-83.

[6] The page numbers refer to the page number of the transcript itself.

At the August Trial, Faustin testified that there was no such lease. Instead, Faustin explained that Andrews was a squatter, who obtained keys from for the house from a friend who was a real estate agent. Aug. Tr. 174, 177. As discussed above, Faustin also testified that Andrews distributed narcotics from the Smithtown House. The Government, ultimately, determined that it would not introduce the crack cocaine evidence from the Smithtown House at the August trial because it had come to learn that certain photographs of the search—which were consistent with the Government's positions during the suppression hearing—had not been produced to Andrews prior to the December 2019 suppression hearing.

II.     **The Applicable Guidelines Range, Using the Powder Cocaine Guidelines, is 78 to 97 Months' Imprisonment.**

At sentencing, the Government urges the Court to calculate the defendant's Guidelines in reference to the powder cocaine guidelines, in light of DOJ policies promoting the equivalent treatment of crack and powder cocaine offenses.

As described in detail below, the Government submits that the offense involves at least 200 grams of crack cocaine and powder cocaine. Using the powder cocaine guidelines, that results in a base offense level of 18, pursuant to U.S.S.G. § 2D1.1(c)(11). Furthermore, the Government submits that the defendant's Guidelines are subject to the following enhancements: (1) a two-level enhancement because the defendant maintained a premises to distribute narcotics (U.S.S.G. § 2D1.1(b)(12)); (2) a two-level enhancement because the defendant was a manager in the narcotics conspiracy (U.S.S.G. § 3B1.1(c)); (3) a two-level enhancement because the defendant committed the offense as part of a pattern of criminal conduct engaged in as a livelihood (U.S.S.G. § 2D1.1(b)(16)(E)); and (4) a two-level enhancement because the defendant engaged in obstructive conduct in the SDNY proceeding, which is material to this proceeding (U.S.S.G. § 3C1.1). Accordingly, the Government submits that the total offense level is 26.

Because the defendant is in Criminal History Category III, the applicable Guidelines range for the defendant is 78 to 97 months' imprisonment.

### A. The Government Proved that the Offense Involved at Least 200 Grams of Crack and Powder Cocaine, which, Under the Powder Cocaine Guidelines, Results in a Base Offense Level of 18.

At the August Trial, the Government proved, by a preponderance of evidence, that the narcotics conspiracy for which Andrews was convicted involved at least 200 grams of crack and powder cocaine.  Using the powder cocaine guidelines, this results in a base offense level of 18, pursuant to U.S.S.G. § 2D1.1(c)(11).  While the Probation Department continues to adopt the cocaine base Guidelines (which would result in a base offense level of 28), the Probation Department has adopted the weight calculation that the Government proved at trial.  *See* PSR ¶ 31.

The tables below summarize a conservative accounting of the Government's evidence of the amount of crack cocaine and powder cocaine involved in the conspiracy based on the following sales or distributions: (1) the Claire Court sales, from January to March 2018; (2) distribution involving Victim-1, from March to May 2018; (3) a single incident where Victim-1 saw Andrews and an unidentified co-conspirator cook crack; and (4) the three sales to the CI in July and August 2018.  As calculated below, at the low-end, the conspiracy involved—in these limited time periods—185.89 grams of crack and powder cocaine; at the high-end, 270.89 grams; and on average, approximately 228.39 grams.  Furthermore, as the trial testimony established that Andrews sold both crack cocaine and powder cocaine at a rate of approximately $100 per gram, this translates to income ranging from these sales of $18,589 to $27,089.

**Table 7: Crack Cocaine Sales**

| Category | Low End | High-End | Average |
|---|---|---|---|
| Crack distributed to Victim-1 [Table 4] | 25 grams | 75 grams | 50 grams |
| Crack Victim-1 sold on Andrews's Behalf [Table 5] | 38.5 grams | 56 grams | 47.25 |
| Crack rock cooked at the Bayshore House | 50 grams | | |
| Claire Court Crack Sales [Table 1] | 32.4 grams | | |
| CI Sales (Crack) [Table 3] | 2.88 grams | | |
| *Total Crack Cocaine* | 148.78 grams | 216.28 grams | 182.53 grams |

**Table 8: Powder Cocaine Sales**

| Category | Low End | High End | Average |
|---|---|---|---|
| Cocaine Victim-1 sold on Andrews's Behalf [Table 5] | 31.5 grams | 49 grams | 40.25 |
| Claire Court Cocaine Sales [Table 2] | 3.6 grams | | |
| CI Sales (Powder Cocaine) [Table 3] | 2.012 grams | | |
| *Total Cocaine Powder* | 37.11 grams | 54.61 grams | 45.86 grams |

**Table 9:  Total Crack and Powder Cocaine Sales**

| | Low End | High End | Average |
|---|---|---|---|
| Total Crack Cocaine | 148.78 grams | 216.28 grams | 182.53 grams |
| Total Cocaine Powder | 37.11 grams | 54.61 grams | 45.86 grams |
| *Total Crack and Powder Cocaine* | 185.89 grams | 270.89 grams | 228.39 grams |
| *Income from Sales* | $18,589 | $27,089 | $22,839 |

What is notable about these tables is what they do *not* include.  They do not include the countless sales that Faustin witnessed at the Bayshore House between January 2018 and May 2018, or the numerous sales she conducted at the ShopRite from March to May 2018, which she was unable to quantify.  They do not include the sales that Faustin delivered to Andrews's other drug customers.  Nor do include any sales from November 2018 to February 2019, such as the sales Faustin witnessed from the Smithtown House.  In other words, these tables contain a fraction of the narcotics that were contemplated by this conspiracy.

"Where the sentencing court determines that the weight of the drugs actually seized from a defendant 'does not reflect the scale of the offense, it 'shall' approximate the actual quantity, based upon a preponderance of the evidence.  *United States v. Garner*, 2 Fed. App'x 115, 117 (2d Cir. 2001).  Here, the Court should accept the Government's higher end (yet still conservative) estimate of 265.89 grams.  Even if the Court began with the lower end estimate of 185.89 grams, it would only need to estimate that the conspiracy involved an additional 15 grams of crack cocaine and powder cocaine.  The preponderance of the evidence easily supports that conclusion.  In a six-week period at Claire Court, the defendant and Faustin sold approximately 32.4 grams of crack and 3.6 grams of powder cocaine, for a total weight at Claire Court of 36 grams.  That amounts to approximately 1.2 grams per day.  At that rate, it would take just 13 additional days for the defendant to sell the additional 15 grams.  Here, the Government's low-end estimate of 185.89 grams does not include any sales from August 2, 2018 to February 27, 2019—*i.e.*, there are *209* days in the conspiracy that are not accounted for in the Government's calculation.

In support of a lower drug weight, Andrews principally argues that the testimony of Victim-1 and Faustin was unreliable.  However, when the jury found that the conspiracy

involved at least 28 grams of crack, it implicitly found *both* witnesses reliable.  It would make

little sense for the jury to credit Faustin's testimony, and entirely reject Victim-1's testimony,

given how consistent their testimonies were.  Nor does it make any sense that jury rejected

Faustin's testimony and not Victim-1's, given how Faustin's testimony was corroborated by

Victim-1's testimony, the undercover buys, and the photographs of crack on Andrews's iCloud

account.

Andrews's other efforts to attack Victim-1's testimony are similarly unavailing.  For

example, Andrews cherry picks testimony to the effect that Andrews distribution to Victim-1

was "irregular" or that there were periods when they did not see each other.  However, while

Victim-1 testified that Andrews provided crack to Victim-1 on an "irregular basis"—consistent

with his using and withholding crack from Victim-1 to traffic her—the irregular cadence of

Andrews's distribution of crack to Victim-1 does not diminish Victim-1's testimony that she

received crack from him or Faustin approximately 50 to 70 times in a three-month period.

Likewise, while Andrews's then-counsel attempted to impeach Victim-1 on the number of times

Victim-1 sold eight-balls for Andrews by using Government notes of a proffer from August 2018

(which reflect the note-taker writing that Victim-1 had said she sold drugs for Andrews ten to

twenty times), Victim-1 stood by her testimony that she sold for Andrews approximately twenty

to thirty times.  Furthermore, with respect to Victim-1's hallucinations, Victim-1 made clear that

she knew the difference between reality and her hallucinations, and that she was not

hallucinating during the events she had described to the jury.  Aug. Tr. 338.

Andrews also points to purported inconsistencies between Faustin and Victim-1's

testimony, arguing, for example, that while Victim-1 testified that Andrews distributed crack to

her 50 to 70 times, Faustin only testified that such distribution occurred "several times."  Sent

Mem. at 5-6; Aug. Tr. 273.  On its face, that testimony is plainly consistent.  Moreover, Victim-1 was the consumer of those drugs, so it is hardly surprising that Victim-1 had a more specific recollection of the number of times she received narcotics from Faustin or Andrews.

**B.    A Two-Point Enhancement Applies Because Andrews Was a Manager in the Conspiracy**

U.S.S.G. §3B.1.1(c) provides that, "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity," other than as described in §3B.1.1(a) or (b), a two-level enhancement applies.  For this enhancement to apply, "the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants."  U.S.S.G. §3B.1.1, Application Note 2.  The Second Circuit has held that the enhancement applies when a defendant "exercised some degree of control over others involved in the commission of the offense . . . or played a significant role in the decision to recruit or to supervise lower-level participants" and that a defendant "need only manage or supervise a single other participant to warrant a § 3B1.1(c) enhancement."  *United States v. Garcia*, 413 F.3d 201, 223 (2d Cir. 2005).

Here, the trial testimony amply supports the application of a two-point managerial enhancement.  Shortly after she started to date Andrews, Faustin learned that Andrews was a crack and powder cocaine dealer and recruited her to sell drugs for him.  As the Second Circuit has explained, recruitment of an additional party can "by itself" support an enhancement under § 3B1.1(c). *See Garcia*, 413 F.3d at 223. Andrews's supervision of Faustin is also established by the fact that Andrews had drug customers, would direct Faustin to sell to them or deliver drugs to them, and would take all of the proceeds.  *See* Aug. Tr. 208-209.  Further showing his leadership role in the conspiracy, Andrews told Faustin that she was uncomfortable selling drugs, and that if they were ever caught, "he would take the blame for it."  Aug. Tr. 178.

### C.     A Two-Point "Stash House" Enhancement Applies

U.S.S.G. § 2D1.1(b)(12) provides a two-level enhancement for a defendant who maintains a premises for the purpose of manufacturing or distributing a controlled substance. The trial testimony firmly established that defendant maintained two houses—the Bayshore House and the Smithtown House—that were used for this purpose.  Indeed, the defendant does not contest the applicability of this provision.  *See* Sent. Mem. at 18.

### D.     A Two-Point "Criminal Livelihood Enhancement" Applies

U.S.S.G. § 2D1.1(b)(16)(E) provides for a two-level enhancement for offenses committed as a part of a pattern of criminal conduct engaged in as a livelihood.  Application Note 20 to § 2D1.1 states that "[f]or purposes of subsection (b)(15)(E)" the terms "pattern of criminal conduct" and "engaged in as a livelihood" have the meaning set forth in U.S.S.G. § 4B1.3.  Application Note 1 to U.S.S.G. § 4B1.3, in turn, provides that a "'[p]attern of criminal conduct' means planned criminal acts occurring over a substantial period of time. Such acts may involve a single course of conduct or independent offenses."  Application Note 2 of U.S.S.G. § 4B1.3 defines "engaged in as a livelihood" to require that:

> (A) the defendant derived income from the pattern of criminal conduct that in any twelve-month period exceeded 2,000 times the then existing hourly minimum wage under federal law; and (B) the totality of circumstances shows that such criminal conduct was the defendant's primary occupation in that twelve-month period . . . .

In *United States v. Pristell*, the Second Circuit held that six months was sufficient to constitute a "substantial period of time."  *United States v. Pristell*, 941 F.3d 44, 53 (2d Cir. 2019).  With respect to the income threshold, the Second Circuit held that the defendant must

derive an income "in excess of $14,500 in any twelve-month period,"[7] and interpreted income to refer to gross income, not net sales. *Id.* at 54.

Here, the Court should infer that the defendant earned more than $14,500 in income from his criminal conduct in a twelve-month period. As discussed in Section II.A, *supra*, the Government estimates at the low-end that the defendant made, in essentially a six-month period (*i.e.*, the Claire Court sales from Early 2018 to March 2018, the distributions involving Victim-1 from March 201 to May 2018, and the sales to the undercover), $18,589. As with the drug amounts computed above, this figure reflects a fraction of the overall income that the defendant made during the period of the charged conspiracy. The trial testimony established, and the PSR does not suggest otherwise, that the defendant's primary occupation was that of a drug dealer. There is no evidence—either at trial or in the defendant's PSR—that he made money from any legitimate source during the charged conspiracy. While Andrews told Faustin's family that he was a barber, Faustin never saw him work in that capacity, even though they were in a serious relationship and practically lived together for nearly two years. Aug. 145-147. Faustin testified that she saw Andrews make money from drug dealing, and that in so doing, he would squat in other people's homes. Aug. Tr. 147, 171, 174, 177. As for the PSR, the defendant did not, on counsel's advice, respond to questions on how he financially supported himself since 2013. PSR ¶ 23. Accordingly, the two-point enhancement for criminal livelihood is applicable to the defendant's Guideline calculation.

---

[7] In 2017, 2018, and 2019, the federal minimum wage was $7.25. *See* U.S. Department of Labor, *History of Changes to the Minimum Wage Law*, *available at* https://www.dol.gov/agencies/whd/minimum-wage/history (last accessed May 26, 2023). Two-thousand times $7.25 is $14,500.

### E.    A Two-Point Enhancement Applies for Obstruction of Justice

#### 1.    Relevant Law

Under U.S.S.G. § 3C1.1, "[i]f (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (I) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense," the offense level is increased by two levels. U.S.S.G. § 3C1.1. Conduct covered under this section includes "committing, suborning, or attempting to suborn perjury." U.S.S.G. § 3C1.1, comment. (n.4(b)).  Furthermore, "obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction."  U.S.S.G § 3C1.1, Application Note 1.

In *United States v. Zagari*, 111 F.3d 307 (2d Cir. 1997), the Second Circuit observed that perjury is one of the ways in which a defendant may earn an obstruction-of-justice enhancement, but that there is "an additional twist" on the ordinary considerations "[w]here . . . the enhancement is applied based upon perjury made not in the instant judicial proceeding."  *Id.* at 329.  The Second Circuit held that, in that situation, application of the enhancement requires that the false testimony must not just have been "material to the related proceeding," but must also have been "material to the instant action." *Id*. (emphasis in original). The Second Circuit concluded its analysis by articulating what amounts to a four-part test for applying an obstruction-of-justice enhancement when the perjury in question occurred in a separate proceeding: "We thus hold that, when false testimony in a related but separate judicial proceeding is raised as the basis for a § 3C1.1 obstruction of justice enhancement, a sentencing court may only apply the enhancement upon making specific findings that [1] the defendant

intentionally gave false testimony [2] which was material to the proceeding in which it was given, [3] that the testimony was made willfully, *i.e.*, with the specific purpose of obstructing justice, and [4] that the testimony was material to the instant offense." *Id.*

The commentary to Section 3C1.1 defines "material" evidence, as it relates to the obstruction enhancement, as "evidence, fact, statement or information that, if believed, would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1, comment. (n.6). There must be a finding that "the defendant's statements unambiguously demonstrate an intent to obstruct." *United States v. Kelly*, 147 F.3d 172, 178-79 (2d Cir. 1998). The sentencing court "must make a finding of specific intent." *United States v. Giraldo*, 80 F.3d 667,680 (2d Cir. 1996); *United States v. Case*, 180 F.3d at 467. When a sentencing court imposes an obstruction enhancement, "separate findings of fact. . .are encouraged but not required as long as a general finding of obstruction. . .tracks those factual predicates necessary to support a finding of perjury." *United States v. Catano-Alzate*, 62 F.3d 41, 42 (2d Cir. 1995) (per curiam) (internal quotation marks and citations omitted).

Even when a defendant's testimony is so untruthful that the factual prerequisites to a perjury enhancement are obvious, the district court is not relieved "of the burden of making its own independent findings." *United States v. Williams*, 79 F.3d 334, 337-38 (2d Cir. 1996). The district court's finding "that the defendant consciously acted with the purpose of obstructing justice" must be supported by facts "proven only by a preponderance of the evidence." *United States v. Cutler*, 520 F.3d 136,167 (2d Cir. 2008).

    **2.    Discussion**

All of the requirements set forth by the *Zagari* court are present here, and this Court should apply a two-point obstruction enhancement.

*First*, Andrews gave intentionally false testimony at the SDNY Suppression Hearing.  In his affidavit, which he filed in support of a motion to suppress evidence seized from the Smithtown House, Andrews stated that Faustin was the "named lessee for the premises."  Ex C, ¶ 3.  This statement was false: as Faustin testified, Andrews was a squatter at the Smithtown House.  Furthermore, the falsity of the statement was intentional.  Given that it was Andrews who found the house and paid for it, there can be no innocent mistake that he thought Faustin had a lease.  While Judge Engelmayer stopped short of calling Andrews's statement regarding the lease intentionally false, that is not dispositive of his intent.  With respect to another false statement in Andrews's affidavit (that the crack that was seized from the top of a dresser was not in plain view), Judge Engelmayer noted that Andrews had "an obvious motive to lie on this point, to prevent evidence of that crack cocaine that was found alongside him in a bedroom from being received a trial."  Ex. D, at 9.  Moreover, Judge Engelmayer did not have before him Faustin's August 2021 testimony, that made it plainly clear that Andrews's affidavit was intentionally false.

*Second*, Andrews's false testimony was material to the SDNY proceeding.  Among several issues, the hearing considered whether Andrews had standing to challenge the evidence seized from the Smithtown House, which turned on whether he had a privacy interest in the Smithtown House.  Because trespassers lack such standing, Andrews's testimony that there was a lease, if credited, would have influenced the proceeding insofar as it would have established standing to challenge the search.  *Third*, the intentionally false statement had the specific purpose of obstructing that proceeding.  By falsely asserting that there was a lease, Andrews attempted, through a falsity, to establish standing to challenge and suppress the seized evidence, when he in fact had no such standing.  That is clearly obstructive conduct.

*Fourth*, the false testimony was also material to this action.  The EDNY case is a prosecution for the same—and additional conduct—as the SDNY case.  Andrews's effort to suppress drug evidence in the SDNY case (where there was no narcotics charge) was just as material to the EDNY proceeding, where he was charged with narcotics conspiracy.  Moreover, his statement that he stayed at the Smithtown House pursuant to a lease is also material to sentencing.  The fact that Andrews maintained stash houses out of homes where he was a trespasser is certainly relevant to the Court's consideration of Section3553(a) factors, including the nature and seriousness of the offense.

As Andrews concedes, he "may have been responsible for obstructing or attempting to the obstruct the sex trafficking offenses."  Sent. Mem. 8-9.  Despite this admission, he argues that, because the EDNY case is separate case from the SDNY case, the obstruction enhancement cannot apply, or that only the judge who presided over the obstructive conduct could make a finding as to intentionality and willfulness.  *Id.* at 9.  That position is unsupported by the text of the enhancement and the case law, which make clear that the obstructive conduct can occur before the instant prosecution, or in a separate matter.  *See Zigari*; 111 F.3d at 339; U.S.S.G § 3C1.1, Application Note 1.  Furthermore, this is not the case where Andrews submitted a conclusory affidavit for the purpose of challenging evidence:  instead, he submitted an affidavit with intentional falsehoods for the purpose of thwarting these proceedings.  Under such circumstances, a two-point enhancement should apply.

### F.    Andrews Falls in Criminal History Category III

The Probation Department correctly determined that Andrews is in Criminal History Category III.

The Probation Department correctly assessed two criminal history points for Andrews's October 3, 2007 conviction for conspiracy and criminal possession of a controlled substance, for which he received a sentence of 365 days.  PSR ¶ 55.  That sentence falls within ten years of the charged conduct.  Faustin testified at the trial that, around the end of 2017, Andrews told her that "he needed money and that he would have to start selling drugs again," specifically, crack and cocaine.  Aug. Tr. 147.  This testimony establishes that Andrews's 2007 conviction was within 10 years of the start of the charged conduct.  Accordingly, the Probation Department correctly assessed two criminal history points for this offense, pursuant to U.S.S.G. §§ 4A1.2(b) and 4A1.2(e)(2).

The Probation Department correctly assessed two criminal history points for Andrews's November 30, 2012 conviction for driving while intoxicated.  PSR ¶ 56.  As the appended incarceration records make clear, Andrews served a sentence of 120 days for that conviction. *See* Ex. E (filed under seal).  Accordingly, pursuant to U.S.S.G. 4A1.1(b), two criminal history points are assessed.

## III. The Court Should Consider the Sex Trafficking Conduct in Fashioning the Defendant's Sentence

### A.  Applicable Law

At sentencing, a district court's discretion to consider information about the defendant is "largely unlimited either as to the kind of information [the court] may consider, or the source from which it may come."  *United States v. Carmona*, 873 F.2d 569, 574 (2d Cir. 1989) (citation omitted).  Accordingly, in exercising its discretion in sentencing, the Court should consider the facts adduced at the March Trial in sentencing the defendant.

*First*, Section 3661 of Title 18 of the United States Code provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person

convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Accordingly, a district court may "consider any and all information that reasonably might bear on the proper sentence for the particular defendant." *United States v. Juwa*, 508 F.3d 694, 700 (2d Cir. 2007) (citation omitted); *Carmona*, 873 F.2d at 574 ("Any information or circumstance shedding light on the defendant's background, history and behavior may be properly factored into the sentencing determination."). The law is clear that "unconvicted conduct may be relied upon to adjust a defendant's sentence level as contemplated by the Guidelines based on proof by a preponderance of the evidence." *United States v. Gigante*, 94 F.3d 53, 55 (2d Cir. 1996) (citations omitted); *see also United States v. Concepcion*, 983 F.2d 369, 388 (2d Cir. 1992) ("disputed facts relevant to sentencing, even under the Guidelines, need be established only by a preponderance of the evidence"). In making factual findings under the Sentencing Guidelines, the "sentencing court remains entitled to rely on any type of information known to it." *Concepcion*, 983 F.2d at 388; *see also United States v. Franklyn*, 157 F.3d 90, 97 (2d Cir. 1998).

*Second*, with respect to drug offenses, "all acts and omissions. . .that were part of the same course of conduct or common scheme or plan as the offense of conviction" are relevant conduct under U.S.S.G. § 1B1.3(a)(2). *See also United States v. Pellegrini*, 929 F.2d 55, 56 (2d Cir. 1991). For two offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi. U.S.S.G. § 1B1.3, application note 9(A); *United States v. Shonubi*, 998 F.2d 84, 89 (2d Cir. 1993) (proof of a 'common scheme' requires a connection among participants and occasions). Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are

sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree or ongoing series of offenses.  Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered part of the same course of conduct include the degree of similarity of the offenses, the regularity of the offenses, and the time intervals between the offenses.  When one of the factors is absent, a stronger presence of at least one of the other factors is required. U.S.S.G. § 11.3, application note 9(B); *see United States v. Perdomo*, 927 F.2d 111, 114 (2d Cir. 1991) (proof of same course of conduct does not require a connection between the acts in the form of an overall criminal scheme, but instead focuses on whether the defendant has been engaged in an identifiable behavior pattern of criminal activity).  In the context of a narcotics conviction, relevant conduct is not limited to narcotics sale outside the scope of the charged conspiracy.  Courts have held that other offenses, separate from drug sales, can constitute relevant conduct with respect to the sentencing of a defendant convicted of a narcotics offense.  *See*, *e.g.*, *United States v. Dixon*, 262 Fed. App'x. 300, 301 (2d. Cir. 2008) (homicide properly consider relevant conduct for a defendant who pleaded guilty to narcotics conspiracy).

At minimum, the Court can and should consider the evidence adduced from the March Trial pursuant to Section 3661, and factor that evidence in its analysis of the Section 3553(a) factors.  As the case law discussed above makes clear, this Court has wide discretion to consider the facts adduced from the March Trial in fashioning Andrews's sentence.  For the reasons set forth in Section IV.A, *infra*, Andrews's sex trafficking of Victim-1 should weigh heavily in its consideration of the nature and seriousness of the offense, the need of justice punishment, and deterrence.

Andrews's sex trafficking of Victim-1, which occurred within the period of the charged narcotics conspiracy, also constitutes relevant conduct within the meaning of U.S.S.G. § 1B1.3. Indeed, the record establishes that Andrews's crack dealing and sex trafficking were substantially intertwined on numerous levels.[8] *First*, and most obviously, both the defendant's crack dealing and sex trafficking victimized Victim-1.  Andrews's distribution of crack cocaine not only harmed Victim-1 by feeding her crack addiction; it also was the primary means by which he exercised his dominion over her to cause her to engage in commercial sex acts she did not want to perform.  *Second*, Andrews conspired with the same accomplice—Faustin—to commit both offenses.  In addition to selling crack on Andrews's behalf, Faustin drove Victim-1 to dates for commercial sex act; woke up Victim-1 in the middle of the night so Victim-1 could take calls for sex; and collected the money that Victim-1 made from commercial sex acts.  *Third*, Andrews used crack—the primary narcotic that he sold—as the primary means by which he coerced Victim-1 into committing sex acts she did not want to commit.  And *finally*, Andrews's distribution of crack to Victim-1 arose from his trafficking of her.  Accordingly, Andrews's sex trafficking of Victim-1 shares a common victim, accomplice, and modus operandi with the narcotics conspiracy.

---

[8] Faustin pled guilty to narcotics conspiracy.  In sentencing Faustin on May 12, 2021, Judge Engelmayer considered Faustin's trafficking of Victim-1 as central to her criminal conduct.  *See* Ex. F, May 12, 2021 Transcript of Sentencing of Geraldine Faustin, at 11 (page numbers refer to the page numbers of the transcript).  After her trial testimony in this case, the Government filed a Rule 35 motion for Faustin, and Judge Engelmayer resentenced Faustin to a time-served sentence.

**B.  The Court Should Consider the Sex Trafficking Conduct in Sentencing Andrews**

While Andrews concedes that the Court is free to consider the evidence adduced at the March Trial pursuant to Section 3661, he principally argues that this evidence did not prove that Andrews engaged in sex trafficking.  He is wrong.

As Judge Engelmayer noted after having heard much of the Government's sex trafficking evidence, the Government presented "formidable evidence" concerning Andrews's sex trafficking of Victim-1.  Ex. G, June 15, 2020 Decision Denying Andrews Bail, at 2-3.  That evidence included Victim-1's trial testimony and cross-examination, as well as the "extensive text messages corroborating her account."  *Id.* at 3.  As discussed above, that testimony established that Andrews defrauded Victim-1 to work as a prostitute for Andrews by reneging on his promises to pay her 40 percent of the proceeds from sex trafficking.  Ex. A, March Tr. 132-34, 139, 140-41.  Andrews's conduct was also coercive, as he ensnared Victim-1 in a vicious cycle of reward—in the form of just enough crack to keep her working to meet Andrews's financial goals—and punishment, where he would deprive her of drugs, a feeling Victim-1 described as torture.  Ex. A, March Tr. 83, 88, 96, 100.  Victim-1 therefore kept working towards Andrews's goals—seeking out and performing commercial sex acts that she otherwise would not have done—so that Andrews would give her enough drugs to avoid a debilitating withdrawal. *See*, *e.g.*, Ex. A, March Tr.144-45.

In his sentencing memorandum, Andrew wrongly relies on the Second Circuit's decision in *United States v. Purcell*, 967 F.3d 159 (2d Cir. 2020), which, among other issues, considered the sufficiency of coercion evidence to support guilt beyond a reasonable doubt in a sex trafficking case.  *Purcell* recognized that a finding of coercion in part depends on the particular circumstances of the victim. 967 F.3d at 192. *Purcell* did not, as Andrews appears to suggest, set

a floor for the kind of coercive conduct that must be present to satisfy Section 1591(a).  Instead, *Purcell* established that Section 1591(a) coercion requires that "the defendant know in the sense of being aware of an established modus operandi that will in the future cause a person to engage in prostitution." *Id.* at 193.

Here, Andrews's toxic stew of sex trafficking tactics—fraud, degradation, deprivation, and reward and punishment—was uniquely tailored to coerce Victim-1 based on her particular vulnerabilities.  Indeed, most of the defendant's selection of "pertinent portions" of Victim-1's testimony from the March Trial underscore those vulnerabilities.  *See* Sent. Mem. at 16, points 1 (Victim-1 addicted heroin and crack for more than a decade), 2-3 (Victim-1 had entered a drug detox program but left because she needed drugs), 4 (Victim-1 had no money to pay for drugs and prepared to work as a prostitute to make money), at 7 (Victim-1 a daily crack user).  Andrews makes much about the fact that Victim-1 initially sought out a pimp, that Andrews did not physically strike Victim-1 or have sex with her, and that he did not brand her or physically restrain her.  But nothing in law requires this Court to find that that every commercial sex act Victim-1 performed was the product of coercion, or that Andrews deployed the full complement of sex trafficking tactics that were used in other sex trafficking cases.  Indeed, the cases that Andrews cite in his sentencing submission directly refute many of the arguments that he makes in his submission.  For example, in *United States v. Bell*, 761 F.3d 900 (8th Cir. 2014), the Eight Circuit rejected the notion that a victim's prior voluntarily decision to become a prostitute precludes a finding of sex trafficking, noting that "prostitution histories of these women do not preclude a finding that Bell violated § 1591(a)".  *Bell*, 761 F.3d at 909.  In *United States v. Mack*, 808 F.3d 1074 (6th Cir. 2015), the Sixth Circuit noted that the defendant in that case, like here, exploited a victim's drug addiction by providing heroin to the victim "only after she completed

her 'appointments' with 'Johns.'" *Mack*, 808 F.3d 1074, 1081.  Likewise, *United States v. Fields* stands for the proposition that withholding drugs from a victim can constitute coercion.  *United States v. Fields,* 625 F. App'x. 949, 952 (11th Cir. 2015).  Finally, in *United States v. Carson*, 870 F.3d 584 (7th Cir. 2017), the Eleventh Circuit noted that seemingly voluntarily conduct does not negate a finding of sex trafficking: "Victims of sex trafficking may make decisions that look voluntary at times due to the incredible weight of coercion and force upon them.  And they may make some decisions along the way that are truly voluntary.  Those decisions do not take away from the fact that they have been held hostage, coerced, forced, or threatened to engage in commercial sexual acts." *United States v. Carson*, 870 F.3d 584, 591 (7th Cir. 2017).

Andrews also attempts to discount an instance where he cupped Victim-1's face and put his hands around her neck, justifying this conduct because he was "drunk" and asserting that the behavior was unconnected to Victim-1's commercial sex acts.  Sent. Mem. at 15.  Not only were these acts plainly violent, but Victim-1 also testified that they made her fear Andrews, and as such, contributed to the climate of fear that Andrews created.  Ex. A, March Tr. 151-152.

**IV.        The Court Should Impose a Sentence of 15 Years' Imprisonment.**

In this case, a sentence of 15 years would be sufficient, but not greater than necessary, to reflect the seriousness of the offense; promote respect for the law; provide just punishment for the offense; afford adequate deterrence to criminal conduct; and protect the public from further crimes of the defendant, as required by 18 U.S.C. § 3553(a).

**A.        The Seriousness of the Offense, The Need for Just Punishment, and General Deterrence**

"Truly abhorrent."  "Sadistic."  "Evil."  "Heinous."  "Deeply immoral."  These words, and more, were how Judge Engelmayer described the sex trafficking of Victim-1 during the May 12, 2021 sentencing proceeding of Faustin.  During that sentencing, he considered the trafficking of

34

Victim-1 as relevant to Faustin's sentence—as the Government urges the Court to do here—and made the following remarks about the seriousness of that conduct, which apply with even greater force to Andrews, who recruited Victim-1 to work for him and masterminded the abuse that she endured:

> I sat through the testimony of Victim-[1] at the Carl Andrews trial. It was riveting, it was altogether credible, and it was deeply affecting. I heard her account of how Carl Andrews trafficked her. (Ex. F, at 57)
>
> [. . .]
>
> Your conduct was disgraceful. You exploited the vulnerabilities and, in particular, the severe crack addiction of Victim-[1] to induce her to sell her body for sex to make money for Carl Andrews, and the drug that you plied her with or helped ply her with, crack, is unusually addictive and destructive, as exemplified by Victim-[1] herself. (Ex. F, at 57-58)
>
> [. . .]
>
> You also, in concert with Andrews, shamefully regulated her food intake, and you did nothing to stop Andrews when you would literally deny her food to maintain control over her, much as he was denying her or giving her addictive drugs to cement that control. She was totally dependent on Carl Andrews and on you. He and you regulated her sleep. Her sleep was denied at times to get her to work more. You also helped Victim-[1] pay for the renewal of advertisements for commercial sex acts. When, at the depths of her despair, Victim-[1] reached out to you for food or to avoid eviction from her hotel, according to the testimony, you and Andrews ignored her to further cement her control. (Ex. F, at 58)
>
> [. . .]
>
> This conduct is gravely, gravely serious, for obvious reasons. Along with Andrews, you abused a fellow human being. You exploited her addiction and poverty and emotional fragility to induce her to sell her body for profit. Now, I have seen plenty of cases for which defendants hurt other people by shooting or stabbing them. This is different I kind, but let's say this: your conduct toward Victim-[1] was in it's own way a terrible, sadistic assault. (Ex. F, at 58-59)
>
> [. . .]
>
> Had Victim-[1] remained in captivity to Andrews and you, she might well be dead today or still be a sex slave. Your conduct was deeply immoral, and it lasted for

some time, for a period of months, and the process of controlling and psychologically coercing Victim-[1] to be a sex worker and facilitating her prostitution took time and forethought.  (Ex. F, at 59) [9]

The seriousness of the offense and the need for just punishment are the most significant Section 3553(a) factors that should drive the Court's sentence in this case.  The defendant did not simply supply a dangerous and highly addictive narcotic through Suffolk County for over a year. He used that crack to exploit a vulnerable human and make her, as Judge Engelmayer put it, his "sex slave."  That conduct inflicted on Victim-1 deep, psychological abuse that lasted for several months.  This conduct required planning, and it reflected an utter lack of conscience and concern for the well-being of another human being.  Andrews's psychological abuse made Victim-1

---

[9]    On March 2, 2020 (and prior to the start of the March Trial), Judge Engelmayer sentenced Franklyn Francisco, who pleaded guilty early in the SDNY case to conspiracy to violate the Travel Act, to 24 months imprisonment.  Francisco was originally charged with conspiracy to sex traffic Victim-1, based on his role, in introducing Victim-1 to Andrews. Francisco was involved in the sex trafficking conspiracy for approximately one day.  In sentencing Francisco to 24 months imprisonment, Judge Engelmayer made the following remarks with respect to the conduct involving Victim-1:

> Your offense here was gravely serious. You badly exploited a very vulnerable victim. Victim-[1] was a drug addict, and that was known to you. She was in drug treatment and she essentially escaped or got out of drug treatment simply because she desperately needed her fix of opioids. She went to your house and used narcotics with you and with others. You seized on her vulnerability and steered her to Carl Andrews to become her sex trafficking pimp. . . .
>
> You exposed another human being to sustained abuse and degradation. You helped further her serious drug habit. You put her in a position in which she could easily have been harmed and subjected to violence. Your conduct was heartless and selfish. And as a drug addict yourself, you knew uniquely well just how vulnerable she was when she approached you.

Ex. H, March 2, 2020 Transcript of the Sentencing of Franklyn Francisco, at 33-34 (page numbers refer to the page number of the transcript)

entirely dependent on Andrews, and Andrews leveraged that dependency to fuel his sick, financial interests. He deprived of her drugs, food, and shelter so that she would make money for him by selling her body for sex. This depraved conduct drove Victim-1 to near suicide. To be sure, while the sex trafficking of Victim-1 lasted for approximately three months, it did not end because Andrews realized he made a grave mistake and sought to help her. Rather, it ended because Victim-1 nearly killed herself, and when she failed, she reached out to a law enforcement agent and began her path toward recovery.

Andrews insists that his relationship with Victim-1 was at arms-length: a pimp who supplied drugs to a prostitute, in exchange for money. *See* Sent Mm. at 19. That argument cannot withstand scrutiny. As any seasoned crack dealer like the defendant would know, crack is a highly addictive substance. Andrews knew that Victim-1 was addicted to crack, was homeless, and had no money—so he controlled her for his financial gain by conditioning his distribution of crack to Victim-1 on her making enough money for him. This conduct is simply abhorrent and warrants a substantial term of imprisonment.

### B. The Need for General Deterrence

A significant sentence of approximately 15 years is also necessary for general deterrence. Sex trafficking is all too common. Pimps like Andrews frequently target vulnerable women, including those with drug addictions, and force them to sell their bodies for sex through force, fraud, violence, and coercion. They engage in this highly destructive criminal behavior on the belief that they will not suffer consequences, particularly because the victims in these cases all too often have struggled with various issues, including drug addictions. Accordingly, a substantial sentence in this case is warranted to send a message that conduct like this ill be met with significant periods of incarceration.

### C.    The Need for Specific Deterrence and To Protect the Public from the Defendant's Crimes

In addition to the nature and seriousness of the offense, a substantial, above-Guidelines sentence is warranted in light of the defendant's substantial criminal history.

Andrews has committed serious, violent crimes since he was a teenager.  At age 17, he was arrested, along with two others, for assaulting a victim whom he and his co-defendants had punched and kicked numerous times in the face and body.  PSR ¶ 43.  At age 21, he was arrested after knocking a woman to the ground at a bank and stealing money.  PSR ¶ 44.  At age 23, he interfered with the arrest of another individual, including by kicking, punching and pushing police officers.  PSR ¶ 45.  At age 23, he was arrested for possessing crack cocaine, packaged in a manner consistent with distribution, which was found in his home.  PSR ¶ 46.  At age 27, he was arrested after he violated an order of protection related to his ex-wife, whereby he "pulled her hair and squeezed her breasts."  PSR ¶ 48.  When he was 24, he stole a car.  PSR ¶ 48.  At age 27, he was arrested with another two individuals after assaulting four victims.  At age 28, Andrews was arrested after repeatedly punching his ex-wife.  At age 30, he again impeded another individual's arrest and used physical force against law enforcement officers, and then in another incident, violated an order of protection by putting his hands around his ex-wife neck and threatening her.  PSR ¶ 51-52.  At age 31, he was arrested after he physically assaulted a law enforcement who attempted to arrest him.  Nearly every one of these offenses were plainly violent, none were met with any significant period of incarceration, and as a result, none of them are reflected in his criminal history score.[10]

---

[10] Even in his sentencing submission, Andrews minimizes the conduct leading to his domestic violence arrests by noting that his relationship with his ex-wife was "toxic."  Sent Mem. 33

In addition to these convictions that caried no criminal history points, Andrews received a one-year sentence in 2007 for conspiracy and criminal possession of a controlled substance.  He also has two convictions related to driving under the influence.  PSR ¶¶ 56-57.

In total, Andrews has been convicted of 17 crimes, not including the instant offense or juvenile offenses.  At age 34, he began to commit the federal offenses with which he was charged.  As Judge Engelmayer noted when he first denied bail for the defendant, "after reaching an age which all would agree that a person is supposed to have migrated into maturity, he continues to have a substantial criminal record;" "there is a recurrent pattern of committing crimes, and not just crimes, diverse crimes." Ex. I, Transcript of March 25, 2019 Bail Hearing, at 24-25.  The defendant has not shown any real indication that he is aging out of his criminal past.  Accordingly, a substantial term of incarceration is appropriate in light of his criminal history.

## **CONCLUSION**

Carl Andrews's crimes were heinous.  He sadistically abused another human being, and he should be punished accordingly.  For this reason, the Court should impose a sentence of approximately 15 years' imprisonment.

Dated: May 26, 2023
New York, New York

Respectfully submitted,

DAMIAN WILIAMS
United States Attorney for the
Southern District of New York

By:  **/s/**
Rushmi Bhaskaran
Elizabeth A. Espinosa
Assistant United States Attorneys
(212) 637-2439 / 2216